# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HARRISON WELLS PARTNERS, LLC, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 09 C 2445 |
| CHIEFTAIN CONSTRUCTION, LTD., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Harrison Wells Partners, LLC has sued Chieftain Construction Holdings, Ltd. for breach of contract and fraud in connection with a real estate purchase agreement ("the Agreement") the parties entered into in February 2008. Chieftain has counterclaimed, alleging breach of the same agreement. The Court has jurisdiction based on diversity of citizenship.

On February 24, 2010, Harrison Wells voluntarily dismissed its fraud claim with prejudice. Harrison Wells has moved for summary judgment on its breach of contract claim and Chieftain's counterclaim. The Court presumes familiarity with its prior decision in this case. *See Harrison Wells Partners, LLC v. Chieftain Constr. Holdings, Ltd.*, No. 09-2445, 2009 WL 3010847, at *1 (N.D. Ill. Sept. 16, 2009). Any additional facts that are relevant to the case are discussed in the legal analysis that follows.

**Discussion**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *AA Sales & Assocs., Inc. v. Coni-Seal, Inc.,* 550 F. 3d 605, 609 (7th Cir. 2008). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Chieftain claims that Harrison Wells breached the Agreement when the market value of the property fell below the price the parties negotiated and agreed upon. The parties also dispute whether a fence properly enclosed the property, which is an open lot, as required by a Chicago ordinance. Finally, Harrison Wells alleges that Chieftain breached the Agreement by failing to make the required "advanced carrying cost deposit" ("the deposit") on March 1, 2009. Chieftain contends it did not breach the Agreement because, by March 1, 2009, it had terminated the Agreement and was no longer required to make the deposit.

The parties' arguments depend on the meaning of certain terms in the Agreement. The Court must, therefore, construe the meaning of words in the contract in a manner consistent with Illinois rules of contract interpretation.

**A.     Disputed terms in the Agreement**

The Agreement provides for the purchase and sale of a parcel of land located at the southwest corner of Harrison and Wells Streets.  Chieftain promised to purchase the property "[as is] . . . in its condition . . . subject to reasonable use, wear, tear and natural deterioration."  Pl.'s L.R. 56.1 Stat., Ex. 2 at 10.  The Agreement also provides that

> Purchaser hereby fully and irrevocably releases Seller and its agents and representatives from any and all claims Purchaser may now have or hereafter acquire against Seller or its agents or representatives for any cost, loss, liability, expense, damage, action or cause of action arising from or relating to the condition of the Property . . . except for claims based upon the representations and warranties of Seller set forth in this Agreement.

*Id.*

The parties dispute the meaning of the following provisions of the Agreement:

Additional Conditions

> Without limitation of any other provisions of this Agreement, it shall be a condition of Purchaser's obligation to consummate the transaction hereunder that . . .
>
> > (b) the Property shall be in the *same condition* as exists as of the date of this Agreement (subject to reasonable use, wear, tear and natural deterioration of the Property between the date hereof and the Closing Date and to any acts of Purchaser or its officers, employees, agents, contractors or consultants thereon)
>
> . . .

Representations and Warranties

> (a) Seller hereby represents and warrants to Purchaser now, and remakes such representations and warranties to Purchaser upon the Closing, as

3

follows:

> . . .
>
> (ii) [T]he Property shall be maintained by Seller from the date hereof through the Closing in the *same manner or condition as required by applicable Laws* with respect to the Property on the date hereof, subject to Purchaser's acts pursuant to this Agreement.
>
> . . .
>
> (iv) To the best of Seller's knowledge, *there is no violation of Law relating to the Property* as of the date of this Agreement *that has not been corrected*.

*Id.* at 13, 18 (emphasis added).

In paragraph fourteen, the Agreement also provides that:

> (a) If any of the representations or warranties of the Seller is not true, complete accurate in all material respects or if Seller fails to perform any of its obligations under this Agreement in strict accordance with the terms for any reason, Seller shall be in default under this Agreement, and Purchaser shall be entitled, . . . to a return of the Earnest Money, together with any and all interest thereon, and . . . to terminate this Agreement, in which case this Agreement shall be null and void and the parties hereto shall have no further rights, obligations or liabilities under this Agreement except as otherwise provided in this Agreement. . . . Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall have given written notice of such breach to Seller in accordance with the terms of this Agreement, and Seller shall have failed to cure such breach within fifteen (15) days after receipt of such notice.

*Id.* at 20.

Chieftain contends that the phrase "same condition" in paragraphs eight and thirteen of the Agreement contemplates not only physical changes to the property but also changes in its economic value. It claims that Harrison Wells breached the

4

Agreement when the property lost economic value, because Harrison Wells could not maintain the property in the "same condition" that existed when the parties entered into the Agreement. Harrison Wells contends that the term "condition" refers only to the property's physical condition, not its economic value.

Chieftain also contends that Harrison Wells breached paragraph thirteen of the Agreement because it maintained the property in violation of a Chicago ordinance. Section 7-28-750 of the Chicago Municipal Code provides that "[i]t shall be the duty of the owner of any open lot located within the City of Chicago to cause the lot to be surrounded with a noncombustible screen fence." Chicago Mun. Code § 7-28-750(a). Chieftain alleges that Harrison Wells failed to place a fence on the southern and western borders of the vacant lot. Chieftain contends that even if Harrison Wells later put up the fence, it did not do so within fifteen days after receiving notice of the breach as required by the Agreement. Harrison Wells states that it never violated the ordinance. Even assuming a violation occurred, however, Harrison Wells contends that it timely erected the portion of the fence that Chieftain alleged was missing.

Pursuant to the Agreement, Chieftain was required to make a deposit of $285,000 into the escrow account on March 1, 2009. Chieftain contends that it terminated its agreement with Harrison Wells on February 27, 2009. As a result, Chieftain claims, it was no longer required to make the March 1, 2009 deposit. Harrison Wells contends that through Chieftain's February 27, 2009 letter, it received notice of a possible breach and that, from that date, it had fifteen days to cure the breach. It contends that as of March 1, 2009, Chieftain was still bound by the Agreement and that

5

by failing to make the required deposit, it breached the Agreement.

## B. Illinois rules of contract interpretation

The rules of contract interpretation in Illinois require courts to "constru[e] the contract . . . to give effect to the parties' intent as expressed in the terms of their written agreement." *Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 379 (7th Cir. 2009). Courts enforce contracts with unambiguous terms as written. *Id.* at 380. If a contract's terms "are indefinite or have a double meaning," courts must then "look to extrinsic evidence to determine the parties' intent." *Id.* at 379-80.

Chieftain contends that the Agreement is ambiguous because the term "condition" is reasonably susceptible to a meaning that includes the property's economic value. Chieftain claims that extrinsic evidence is needed to determine the parties' intent. In Illinois, however, a contract is not "ambiguous simply because the parties offer different interpretations of its language. . . . Rather, whether a contract is ambiguous is a question of law." *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir. 2009).

When examining a contract's language, courts "may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract . . . defines its terms, the court must give the contractual language its common and generally accepted meaning." *Dean Mgmt., Inc. v. TBS Constr., Inc.,* 339 Ill. App. 3d 263, 269, 790 N.E.2d 934, 939 (2003). Moreover, because both parties are in the real estate business, they "are presumed to have contracted with reference to the particular customs and usages of the trade[,] and it is proper [for the Court] to resort to such customs and usages to interpret the contract." *Fifteenth Avenue Christian Church v.*

6

*Moline Heating & Constr. Co.,* 131 Ill. App. 2d 766, 769, 265 N.E.2d 405, 408 (1970); *see also, Midwest Envtl. Consulting & Remediation Servs., Inc. v. Peoples Bank of Bloomington,* 251 Ill. App. 3d 256, 269, 620 N.E.2d 469, 478 (1993) ("When a person or company deals in a market, it is presumed that they deal in accordance with general and uniform customs and usages prevalent in that market.").

1. **The drop in the property's market value**

The parties agree that the term "same condition," as historically used in real estate contracts, refers to the physical condition of the property. Chieftain contends, however, that when the parties negotiated the Agreement, they understood the term "condition" to include the property's physical condition and its economic condition.

Chieftain heavily relies on *S & H Realty & Inv. Co. v. Consumers Budget Loan Co.,* 8 Ill. App. 3d 206, 289 N.E.2d 696 (1972), to argue that the term "same condition" may be interpreted to include economic conditions. *S & H Realty*, however, is different from this case in one important respect. A clause in the contract the *S & H Realty* parties negotiated provided that:

> It is agreed by and between the parties . . . that if during the term of this lease . . . any law, decision, regulation or condition exists, continues or is made effectual in this City, State or Nation *which in the judgment of the lessee adversely affects or makes it unprofitable* for the lessee to carry on its business in these premises, then in any such event this lease may be canceled.

*Id.* at 207, 289 N.E.2d at 697 (emphasis added). It is clear that the parties in *S & H Realty* intended to include economic factors as a variable in the contract, because they expressly tied the lessee's obligation to perform to its ability to make a profit in the

7

leased premises. *See id.*

Unlike the lease at issue in *S & H Realty*, there is nothing in the Agreement in this case suggesting that the parties in this case intended to tie performance to unpredictable market conditions. And even were the Court to consider extrinsic evidence, no one who took part in negotiating the Agreement has submitted an affidavit stating that the parties contemplated fluctuations in the value of the property as included in the contractual reference to "condition[s]."

The Court must also read the Agreement's terms in "the context of the contract as a whole." *Dean Mgmt.,* 339 Ill. App. 3d at 269, 790 N.E.2d at 939. In this case, there is no basis to conclude that the parties intended to include economic conditions. Indeed, the Agreement implicitly limits the meaning of the term "same condition." It provides that Harrison Wells will keep the property in "the same condition as exists as of the date of this Agreement (subject to reasonable use, wear, tear and natural deterioration of the Property . . . and to any acts of Purchaser.)." *Id.* at 13. This reflects that the term "same condition" refers to physical attributes of the property and changes caused by the seller (as opposed to the Purchaser). Chieftain does not contend that Harrison Wells did anything to the property that resulted in the reduction in its market value.

Chieftain seeks to hold Harrison Wells liable for the fact that the property it agreed to purchase in 2008 decreased in market value before the closing date. "Illinois law avoids interpretations that render a contract inequitable, unusual, or such as reasonable men would not be likely to enter into." *Curia,* 587 F.3d at 831-32 (internal

quotation marks and citation omitted). Moreover, "[j]udges endeavor to read contracts to make economic sense." *Superl Sequoia Ltd. v. Carlson Co.,* No. 09-2406, 2010 WL 3155907, at *5 (7th Cir. Aug. 11, 2010). It would make no economic sense for a property seller like Harrison Wells to assume contractual responsibility for vicissitudes in market conditions.

Chieftain's remaining arguments fare no better. It claims that because the property consists of a vacant lot it planned to develop, interpreting "same condition" to refer only to physical conditions renders the clause meaningless, because vacant land is not subject to material physical change. Nothing about the vacancy of the lot, however, renders the clause meaningless. There are any number of things a seller could do to a vacant lot to change its physical attributes and thus diminish its value – for example, dumping rubbish there. "Physical changes" might also occur even without the owner's intervention – for example, the appearance of a sinkhole.

Chieftain further contends that the context of the Agreement gives the term "same condition" broader meaning. It states that the property was purchased to construct a development and that the project required financing. It notes that there was an eighteen month gap between the contract date and the closing date. Chieftain also points out that the Agreement does not include a separate financing contingency, which if present in the Agreement might enable Chieftain to terminate the contract were it unable to secure financing. For these reasons, Chieftain contends, the "same condition" clause "is the sole protection of the buyer for altered conditions between the [Agreement] date and the closing deadline 18 months later." Def.'s Br. at 3.

9

Both parties, however, are sophisticated business entities that deal in the real estate market. Chieftain was certainly aware that the market value of the property could rise or fall in the eighteen month time frame. It also had to be aware there was no guarantee it could actually secure financing. The fact that the Agreement does not include a financing or other contingency, therefore, bolsters Harrison Wells' argument that the parties never intended to give Chieftain an "out" on these grounds.

The Court concludes that no reasonable factfinder could conclude that Harrison Wells breached the contract when the property suffered a decrease in value prior to closing.

### 2. Required fencing around lot pursuant to Chicago ordinance

Chieftain contends that Harrison Wells breached the Agreement because it failed to comply with a Chicago ordinance requiring a fence on the southern and western borders of the property. To prove that Chieftain breached the Agreement, Harrison Wells must show it performed under the contract. *Preibe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Indeed, Illinois law requires a plaintiff's compliance with conditions precedent to the defendant's performance. *See Normand v. Orkin Exterminating Co.,* 193 F.3d 908, 912 (7th Cir. 1999) ("[F]ailure of one party to a contract to perform may excuse nonperformance by the other, . . . that is . . . the familiar doctrine of contract conditions.") (citing *Baird v. Evans*, 20 Ill. 29 (1858); *Contract Dev. Corp. v. Beck*, 255 Ill. App. 3d 660, 666, 627 N.E.2d 760, 765 (1994); *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 261, 594 N.E.2d 1177, 1186-87 (1992)); *see also, e.g., 360networks Tennessee, LLC v. Illinois Cent. R.R. Co.*, Nos. 05-

3198, 05-3200, 06-5558, 2010 WL 2167394, at *2 (N.D. Ill. May 28, 2010).

In its complaint, Harrison Wells alleges that Chieftain breached the Agreement. Chieftain may terminate the Agreement, however, if a violation of law relating to the property remained uncorrected. Chieftain contends that Harrison Wells violated the Agreement by failing to put up the fence at all, or at least to put it up within fifteen days after receipt of notice. Harrison Wells must prove, therefore, that it complied with both of these conditions precedent to Chieftain's performance.

David Crawford, a member of Harrison Wells, states in an affidavit that a fence was built along the southern and western borders of the property on March 16, 2009. Pictures of the vacant lot show that a fence borders the northern and eastern borders of the property and that the new fence was placed on the lot's southern and western borders. Crawford Aff., Ex. B. Harrison Wells' evidence, therefore, shows that it put the fence up well before the March 24, 2009 closing date.

Chieftain claims that evidence showing that the fence was erected on March 16, 2009 fails to support Harrison Wells' contention that the fence was still in place on the March 24, 2009 closing date. To avoid summary judgment, however, a non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*, 475 U.S. 574, 586 (1986). Specifically, a non-moving party must go beyond the pleadings and set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis omitted).

As the Court has indicated, the evidence demonstrates that Harrison Wells put

up and fully enclosed the property with a fence on March 16, 2009. There is no basis in the record to assume that Harrison Wells or anyone else took down the fence on or before the March 24, 2009 closing date. If Chieftain has some basis to believe that the fence was taken down, then it needed to include that evidence in its response to Harrison Wells' motion. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (internal quotation marks and citation omitted).

Alternatively, Chieftain claims that Harrison Wells violated the Agreement by failing to enclose the property with a fence within fifteen days after receipt of notice of the breach. Chieftain sent its February 27, 2009 letter giving notice of the alleged breach via facsimile, e-mail, and overnight mail. It contends that February 27, 2009 was the date of receipt.

The Agreement provides that notice "is deemed given when received, if personally delivered, or one business day after delivery thereof to a nationally recognized overnight delivery service which provides a receipt of service." Pl.'s L.R. 56.1 Stat., Ex. 2 at 14. Chieftain's notice was not delivered physically. Thus under the Agreement's plain language, Harrison Wells is considered to have received notice one business day after Chieftain delivered it to the overnight delivery service.

Chieftain delivered the letter to the overnight delivery service on February 27, 2009, which was a Friday. The next business day was Monday, March 2, 2009. Under the Agreement, therefore, Harrison Wells is deemed to have received notice on March

2, 2009. It had fifteen days from that date to cure the alleged breach. The evidence shows that the property was enclosed by a fence on March 16, 2009, or fourteen days after Harrison Wells received notice of the breach. No reasonable factfinder could find otherwise.

The Agreement does not contain any provision suggesting that notice sent by facsimile or e-mail is considered to be given upon receipt or earlier than the date for notice via overnight delivery. The Court cannot appropriately read new terms into the parties' contract. They themselves defined only two acceptable means of notice.

The property was, therefore, enclosed by a fence and thus complied with the Chicago ordinance. In short, there was no breach of the Agreement by Harrison Wells.

### 3. The March 1, 2009 deposit

Chieftain contends that it was not required to make the March 1, 2009 deposit because, as of February 27, 2009, it was no longer bound by the contract. The Court rejects this argument. For the reasons previously explained, Harrison Wells never breached the Agreement or any of its conditions. Thus, Chieftain was required to make the March 1, 2009 deposit.

Even if Harrison Wells had breached the contract, Chieftain could not have unilaterally terminated the Agreement via the February 27, 2009 letter. The letter purports to anticipate Harrison Wells' inability to cure the alleged breaches by the closing date. Even if Chieftain's predictions had been proven correct, however, the Agreement provides that the "Purchaser shall not have any remedy for any breach . . . unless Purchaser . . . [has] given written notice of such breach . . . and Seller . . . [has]

13

failed to cure such breach within fifteen days after receipt of such notice." Pl.'s L.R. 56.1 Stat., Ex. 2 at 14. Chieftain's February 27, 2009 letter, at most, constituted notice to Harrison Wells of two possible breaches. From that date, Harrison Wells had fifteen days to cure any breach.

In sum, the Agreement was not, as Chieftain contends, null and void effective February 27, 2009. Rather, between February 27, 2009 and March 17, 2009, the Agreement remained in effect, and Harrison Wells had the option to cure the alleged breaches. As of March 1, 2009, Chieftain was bound by the Agreement and obligated to act in accordance with its terms. Because the Agreement required Chieftain to deposit $285,000.00 into the escrow account on March 1, 2009, by failing to make the deposit, it breached the terms of the Agreement. No reasonable factfinder could determine otherwise.

## Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment [docket no. 53] and enters summary judgment in plaintiff's favor on Count 1 of the complaint and on defendant's counterclaim. Because plaintiff voluntarily dismissed with prejudice Count 2, the fraud claim, this ruling disposes of the issue of liability on all remaining claims. The case is set for a status hearing on September 2, 2010 at 9:30 a.m. to address the appropriate relief to be awarded to plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 25, 2010